H. LOSE, Assignee of the Estate of M. S. Levy, a Bankrupt,
*v.* THEO. H. DAVIES & CO., Limited.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JANUARY 5, 1897.          DECIDED JANUARY 22, 1897.

JUDD, C.J., FREAR AND WHITING, JJ.

A chattel mortgage is not void for insufficiency of description of (1) the location, where the chattels are described as "belonging to me and situated in Honolulu, pertaining to the business carried on by me at said Honolulu," or (2) the amount of indebtedness, where the mortgage purports to be for a valuable consideration and as security for an indebtedness shown by a certain agreement referred to, and for future advances, the limit of which is not fixed, or (3) the time of payment, no definite time being named; nor is it void as to future advances, after such advances have been made, although the mortgagee was not bound to make them.

Under the circumstances of this case, as set forth in the opinion of the court, a decree for the cancelation of a chattel mortgage upon the ground that the mortgagor was insolvent and that the mortgagee had reasonable cause to believe him to be insolvent, is reversed.

OPINION OF THE COURT BY FREAR, J.

This is a bill in equity for the cancelation of a chattel mortgage upon the grounds (1) that it is ambiguous, defective and insufficient, and (2) that at the time it was made the mortgagor was insolvent and the mortgagee had reasonable cause to believe him to be insolvent.

The arguments upon the first ground are: That the location of the property, the amount of indebtedness and the time of payment are uncertain and insufficiently described; and that the mortgagee was not bound to make the future advances for which the mortgage purports to have been given in part as security. The property is described as the stock in trade, &c., "belonging to me and situated in Honolulu, pertaining to the business carried on by me at said Honolulu." This is a sufficient description of the location so far as appears on the face of the mortgage, and the extrinsic evidence confirms this view. The mortgagor had but one, and that a well known, place of business in Honolulu. The mortgage purports to have been made for a consideration of $6,000, and as security for the indebtedness of the mortgagor to the mortgagee, with interest, as shown by an agreement referred to therein, and also as security for such indebtedness, if any, as should in the future be incurred by the mortgagor to the mortgagee for new goods. The amount of the indebtedness need not be stated in figures. It is sufficient if the mortgage appears, as in this case, to have been made for a valuable consideration, and contains sufficient references for the ascertainment of the amount of indebtedness. No time of payment need be named. If none is named in the mortgage or note or other agreement, the debt is payable on demand. As to future advances, a mortgage is good for such advances as have been made, whether the mortgagee was bound to make them or not, and whether there was any limit fixed or not.

The Circuit Judge sustained the bill and ordered the mortgage canceled on the second ground, namely, that the mortgagor was insolvent, and that the mortgagee had reasonable cause to believe him to be insolvent. We have come to a different conclusion. The circumstances were these: M. S. Levy, after conducting a retail merchandise business in Honolulu for a year and eight months, found himself indebted, in July, 1895, on book account balances, as follows: To H. W. Schmidt & Sons, $11,640.62; to the defendant, a corporation, $1,012.15; to sundry other creditors, a

little over $600. Being then pressed by H. W. Schmidt & Sons, who had carried him up to that time, he applied to the defendant to carry him thereafter. After more or less negotiation for two or three weeks, Levy and the defendant entered into a written agreement, August 1, 1895, whereby Levy was to purchase of the defendant all goods required for his business, and pay therefor in weekly installments the total receipts of his business less necessary expenses, keep the store fixtures and goods insured, give defendant a mortgage of the same, render defendant monthly accounts, take stock annually, allow his books to be open to defendant for examination, and pay interest on debit balances. Before entering into this agreement, the defendant inquired into the condition of Levy's affairs, and was informed by him that his stock of goods was of the cost value of about $4,400, and that his indebtedness was as above stated, except that he said the indebtedness to H. W. Schmidt & Sons was only about $8,000, and that they would settle for about $3,000. Defendant thereupon declined to entertain the proposition, but after further delay Levy said that H. W. Schmidt & Sons would be willing to settle for $1,500. Defendant's head clerk, James Wakefield, in its merchandise department, through whom the negotiations were principally conducted, thereupon indorsed in his own name, but on behalf of the defendant, three notes of $500 each, made by Levy and payable to H. W. Schmidt & Sons in one, two and three months respectively, and received from Levy a bill made out to Levy and signed by H. W. Schmidt & Sons, as follows: "August 1. To amount as per bill rendered (including stock, store furniture and fixtures), $8,-121.58. Settled by notes for $1500.00 endorsed by James Wakefield. H. W. Schmidt & Sons." As a matter of fact, the settlement between Levy and H. W. Schmidt & Sons was as follows: Levy gave, besides the $1500 indorsed notes, $3500 unindorsed notes, payable after the indorsed notes, and the total indebtedness of $11,640.62 was to be considered canceled only on payment of the notes, but this arrangement was unknown to the defendant. There is no evidence as to whether the $600

owing other creditors was due, but there is some evidence that
Levy and the defendant orally agreed upon some arrangement
for the payment of this indebtedness. Thus, so far as appears to
have been known to the defendant, at the date of the agreement,
Levy's stock at cost price amounted to about $4400, and his
indebtedness to about $3100, none of which he had refused or
failed to pay for ten days after the same had matured, as re-
quired by the bankruptcy statute in order to make him a bank-
rupt. The mortgage was made September 24, 1895. At that
time Levy's condition had been changed to this extent. One
note for $500 had been paid, and new goods to the value of
about $1900 had been added to his stock, the indebtedness to
the defendant being thereby considered increased. The sales
had been small on account of the cholera then prevailing. Levy
had not become a bankrupt by reason of any of these changes
since August 1, 1895. He was adjudged a bankrupt a year
later, in September, 1896. Prior to that date, the three in-
dorsed notes and $1025 on account of the unindorsed notes to
H. W. Schmidt & Sons, and the $600 owing to the other credi-
tors had been paid; and the defendant had sold goods and ad-
vanced cash to the amount of $5916.82, on account of which
$875.10 had been paid.

Although Levy was beyond doubt insolvent and had commit-
ted acts of bankruptcy up to Aug. 1, 1895, the date of his agree-
ment with the defendant, and this was known to the defendant,
yet upon that date and also upon the date of the mortgage, so far
as known to the defendant, he was not insolvent and had not
committed any act of bankruptcy from which he had not re-
covered nor was he in contemplation of insolvency or bank-
ruptcy. He had made a new start and the defendant entered
into its agreement with him only on the supposition that all his
debts had been satisfactorily settled, compromised or provided
for, and that H. W. Schmidt & Sons, his principal creditors,
had acquiesced in the new arrangement.

But it is argued that if the defendant had taken reasonable
precautions it would have learned of the unindorsed notes and

Levy's unsettled book account with H. W. Schmidt & Sons and so would have learned that Levy was insolvent. We need not express an opinion as to what would be the result if the defendant had known that those notes had been given and that the book account had not been finally settled, for we are of the opinion that under the circumstances the defendant was not bound to take such steps as would have been necessary to enable it to ascertain these facts. Levy opened a new set of books August 1, 1895, and entered therein as his only indebtedness to H. W. Schmidt & Sons the indorsed notes for $1500. He entered in his old books, bills payable $1500 and profit and loss $9970.02. There was no entry of the unindorsed notes for $3500 in either set of books. It is contended that the defendant should not have accepted Levy's statement of his affairs but should have examined his old books; that such examination would have disclosed the false entry of $9970.02 profit and loss, and shown that the indebtedness to H. W. Schmidt & Sons was over $11,000 instead of about $8000 as stated by Levy and that this knowledge would have necessitated further inquiry, that is, of H. W. Schmidt & Sons personally, which would have resulted in a full disclosure of the facts. A mortgagee is not obliged in every instance to examine the books of his mortgagor before accepting a mortgage. This would be a necessary precaution only under special circumstances. The special circumstance relied on in this case is that the defendant knew that Levy had been carrying on a losing business for some time and had purchased most of his goods of H. W. Schmidt & Sons and was therefore probably indebted to them in a large amount. But Levy's own statement showed this very fact, namely, that he owed H. W. Schmidt & Sons a large amount, about $8000, and that this was probably a true statement was strongly corroborated by the statement over the signature of H. W. Schmidt & Sons themselves showing this amount of indebtedness and that it was "settled" by the indorsed notes for $1500. There was nothing at all to indicate that Levy's books would show a different state of facts. The statement of H. W. Schmidt &

Sons would naturally disarm the defendant of any suspicions that it might otherwise have had with reference to Levy's indebtedness to them. And the honesty of Levy himself was not questioned in the least at that time, as shown by the plaintiff's own witnesses as well as by the witnesses for the defendant. There was therefore nothing that called for an examination of Levy's books by the defendant, and the latter had no reasonable cause to believe Levy to be insolvent. It may be added that the testimony is to the effect not only that the defendant actually believed Levy to be perfectly solvent after its agreement with him of August 1, 1895, but also that H. W. Schmidt & Sons themselves believed him to be perfectly solvent after their agreement with him of the same date; also that the defendant was not in the position of one endeavoring to obtain a preference over other creditors. The proposition for the new arrangement came from Levy and the agreement was entered into by the defendant more with a view to future business than for the purpose of securing the past indebtedness and it actually sold goods and advanced cash to Levy thereafter to the amount of about $6000. It is immaterial that H. W. Schmidt & Sons were innocent parties, the defendant also being innocent. The trouble has arisen evidently through the concealment and misrepresentations of a third party, Levy. As between innocent parties, the loss, if any, due to the fraud of a third party, must remain where it falls.

The question of the effect of the possession of the mortgaged goods taken by the defendant a short time before Levy's bankruptcy, is not raised by the pleadings in this case and will not be considered.

The decree appealed from is reversed and the bill dismissed, with costs.

*A. S. Hartwell*, for plaintiff.

*Thurston & Stanley*, for defendant.